[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
The plaintiff, A.O.D. Construction, Inc. (hereinafter, "A.O.D.") is a Connecticut corporation and the defendant, Town of Plymouth (hereinafter, "Town") is a municipal corporation.
The plaintiff's claims are set forth in a two count amended complaint dated January 3, 1995.
The first count alleges that the plaintiff and defendant entered into a contract on or about January 25, 1990 for the construction of sanitary sewers in the Plymouth Farms area CT Page 6791 identified as Phase 7, Contract #4. The contract was to be completed within 120 consecutive calendar days of the written notice to proceed.
The plaintiff alleges that it completed the work and performed and completed additional work beyond the contract price at the direction of the defendant. Also that it was delayed in completing the project as a result of conduct of the defendant, differing site conditions, being required to work out of sequence, and insufficient or inaccurate plans and specifications.
The second count asserts that the extra work done by the plaintiff was at the request of the defendant, and provided benefits to the defendant.
The defendant filed an answer to the amended complaint dated January 17, 1995. The defendant's pleading contains an answer, special defense and a counterclaim; which contains four counts.
Count one alleges costs and expenses were incurred because of delays by the plaintiff.
Count two claims that the plaintiff failed to perform its work according to specifications and performed its work in a defective manner.
Count three alleges that the plaintiff caused damage to the storm water drainage system.
Count four claims that an offer of compromise was reached and that the plaintiff failed to perform thereunder.
In substantiation of its allegations, the plaintiff first offered the testimony of Thomas S. Juros. Mr. Juros is a Consulting Civil Engineer, licensed in the State of Connecticut. He was the consulting engineer for the defendant on the project in question. His employment is based on a contract between him and the Water Pollution Control Authority (WPCA) dated December 2, 1986. Mr. Juros had reviewed several other sewer projects.
Mr. Juros did the design work and prepared plans dated September 1989 for the entire project. He determined where the sewers were to be located, their size, depth and the slope CT Page 6792 of the pipes. In connection with his responsibilities, he prepared and drafted specifications for the construction of sanitary sewers in the Plymouth Farms area, Phase 7, Contract #4, Plymouth, Connecticut. (Plaintiff's Exhibit A).
The plans prepared by Thomas Juros reflected catch basins, utility and cable TV lines. The plans also indicated "call before you dig"; this was to notify the contractor to call to verify the location of utility and cable TV wires.
The plans and specifications were available for use by those who wished to submit bids for the project. There were 19 bids submitted. The bids ranged from $396,200.00 to $680,600.00, with the plaintiff being accepted as the lowest qualified bidder with a low bid of $396,200.00. Mr. Juros had placed a construction value on the project of $465,900.00.
The plaintiff's bid was prepared and submitted by Alberto DiChello, who has been president of AOD since 1988. He is an experienced contractor who has worked on projects at Bradley International Airport, projects in Hartford and Meriden and has done work for the MDC.
By letter dated January 17, 1990, (Exhibit C), the plaintiff was notified that it had been accepted as low bidder and the contract was signed on January 25, 1990.
Time of completion and liquidated damages are contained on page 7, Article 22 of Exhibit A. Said Article states:
 ARTICLE 22. TIME OF COMPLETION AND LIQUIDATED DAMAGES:
The bidder must agree to commence work on or before a date to be specified in a written "Notice to Proceed" of the Owner and to substantially complete the project within 120 consecutive calendar days thereafter and to fully complete the project within 30 consecutive calendar days thereafter. Bidder must agree also to pay as liquidated damages, the sum of $500.00 for each consecutive calendar day thereafter as hereinafter provided in the Contract and General Conditions. IT IS UNDERSTOOD, TIME IS OF THE ESSENCE.
Article 2(r), page GC-4 defines substantial completion as follows: CT Page 6793
 (r) Whenever the phrases "substantial completion" or "substantially complete" are used in the Contract Documents, they shall mean the essential parts of the project are completely tested and accepted and being sufficiently completed so that the project or specified part can be used for the purposes for which it is intended. For a sanitary sewer project, this means that the sanitary sewer and all house laterals are completely constructed and all sections have passed the leakage test. This does not mean that the disturbed road areas have to be repaved at this time.
Mr. Juros also referred to Article 30 of Exhibit A, entitled "Changes in Plans and Specifications". Said Article states as follows:
ARTICLE 30. CHANGES IN PLANS AND SPECIFICATIONS:
 (A) The Owner reserves the right to make changes in the plan or specifications or to increase or decrease the amount or quantity of the work at any time, before or after construction has commenced.
 (b) Except as hereinafter provided, no such change shall be binding upon the Contractor nor require the payment of additional compensation to the Contractor, unless it has been ordered in writing by the Engineer who has been especially authorized thereto in writing by the Owner pursuant to a resolution having been duly adopted by said Owner.
 (c) Except as hereinafter provided, no oral agreement, conversation or understanding between the Contractor and the Engineer or any inspector, a member or the Owner, before or after the execution of the Contract, shall effect or modify any of the terms or obligations of the Contract Documents or excuse the performance of any work in any manner contrary to the terms of the Contract documents.
 (d) The Contractor shall, however, obey any oral instructions of the Engineer which require no more than a change in location, line or grade of pipes, manholes or other appurtenances, or an increase or CT Page 6794 decrease in the quantities of those items which are covered by unit prices in the proposal.
 (e) For any work performed by the Contractor pursuant to such oral instructions, payment will be made under the unit prices applicable to the work actually done and in accordance with the actual amount of such work done. If such oral instructions decrease the quantities or amount of work, no payment will be made to the Contractor to compensate him for any loss of anticipated profit on the work omitted.
 (f) If the Contractor does not concede that the unit prices in his proposal should be applicable to any work required to be performed under oral instructions of the Engineer, he must notify the Engineer that such unit prices will not apply and, in such case, the oral instructions of the Engineer shall not be effective unless confirmed in writing as hereinabove provided. If such instructions are confirmed in writing, the extra compensation to the Contractor shall be computed as for Extra Work.
 (g) If the Contractor proceeds with the performance of any work in accordance with oral instructions of the Engineer, it shall be conclusively presumed that the unit prices stated in the Contractor's proposal apply to such work and no additional or different compensation will be paid.
 (h) If any change in the plans or specifications are authorized in writing by the Owner, the Contractor shall be paid therefore as provided in the section entitled Extra Work.
 II.
The plaintiff was informed, via a "Notice to Proceed", to proceed with the construction on or before December 31, 1990. The plaintiff commenced the construction work on April 2, 1990. AOD began the project in the easement located near manhole 10, which starting point was determined by the Town.
Before construction commenced, Mr. DiChello, President CT Page 6795 of AOD, drove the project area and videotaped the area. Said video was show at trial. (Exhibit OO). The video purported to show the poor condition of the roads.
At a preconstruction meeting of February 21, 1990, it was discussed that AOD would extend all sewer laterals onto the individual lots, past the curb and a minimum of 3 feet past any burial utilities. (Exhibit D).
The plaintiff asserts that its original bid did not contemplate this additional work and that no additional time was proposed for this work.
Mr. Juros indicated that pursuant to item 3 of Schedule D (Preconstruction meeting) the lateral work was included in the Contract. Mr. Juros referred to Exhibit Y and concluded that the plaintiff was not entitled to extra pay for the lateral work.
Mr. Zwicharowski, who was plaintiff's superintendent, attended the preconstruction meeting. He indicated that it was not clear if the plaintiff was to be paid for the extra lateral work.
Mr. Juros refers to Article 28 of Exhibit A regarding changes in Plans and Specifications. Mr. Juros testified that he felt the plaintiff was paid in full for the lateral work. The court is persuaded by the testimony of Mr. Juros on this claim.
The court finds that the plaintiff has not sustained its burden of proof that it is entitled to extra payment for the lateral work and accordingly, makes no award for this claim.
Through Mr. Juros, the plaintiff elicited testimony showing the basis for delays in completing the project. For example, it was indicated that the plaintiff encountered a stump hole about 30 feet long near a sewer manhole cover #10. However, Mr. Juros indicated that when AOD was scheduled to complete its work, that this entire or overall project would still be incomplete.
The plaintiff refers to Exhibit F, Daily Inspector's Reports and various reports therein indicating problems that CT Page 6796 arose. For example, report #11 dated April 17, 1990, where it is noted, "survey stakeout of easement." The notes state problems with location of utility wires and trees in relationship to the easement. AOD lost about 1 weeks time while this problem was being resolved.
Reports #19, #22, and #26 reflect that the plaintiff encountered stumps, decayed wood, debris, corrugated metal piping and sheet metal piping. These objects were claimed to be unknown to the parties and had to be removed by the plaintiff at his expense.
Mr. Zwicharowski, on behalf of the plaintiff, indicated that there was a delay because of rain. This fact was called to the attention of Mr. Juros via a letter dated May 16, 1990. (Exhibit O). Exhibit RR reflects on page 3 that the plaintiff stated that the April rain fall was 4.82", May rain fall was 7.73" and June rain fall was 2.49" Also, that the defendant required the plaintiff to stop working because of the rainy condition. The plaintiff claims it lost 15 days because of said circumstances.
The plaintiff, by letter dated July 13, 1990, directed to the defendant, referenced specific situations which plaintiff claimed made it impossible to hold to the original job schedule. (Exhibit W).
Also, the plaintiff, by letter dated July 29, 1990, to the defendant, stated that it would be impossible to complete the Contract by the set completion date. Mr. Juros indicated that he did not respond to said correspondence in writing.
Exhibit RR is a correspondence dated February 19, 1991. It is a document setting forth the claims of the plaintiff. Mr. Juros reviewed said correspondence and placed notations thereon. One final notation indicates that he felt that a total of 12 1/2 days delay was justified. This indicates that Mr. Juros felt, that at lease to some extent, some delays were justified.
Exhibit RR sets forth 13 items, in which the plaintiff asserts circumstances whereby it claimed to have lost a total of 121 days and incurred additional costs of $95,440.92.
The claims set forth in Exhibits RR, W, X and GGGG CT Page 6797 outline the claims of the plaintiff and are the major portion of the plaintiff's claim for recovery.
Also, AOD asserts that subsequent to completion of this project, Phase 7, Contract #4, it was called back by the defendant regarding problems that required investigation and corrective work. The plaintiff claims reimbursement for these matters. Said claims will hereinafter be addressed.
Exhibit QQQ reflects minutes of the regular meeting of the WPCA of October 16, 1990. Said minutes reflect that Mr. Juros recommended that AOD lines be accepted for substantial completion as of Friday, October 5, 1990, thereby making the plaintiff 67 days late on the Contract. Said recommendation was approved by the WPCA.
Eugene Zwicharowski, who was the plaintiff's superintendent for the job, estimated that substantial completion occurred between late September 1990 and the first week of October 1990, therefore, the court finds that the date for substantial completion is October 5, 1990.
Exhibit QQQ also shows that AOD asked for an extension to September 15, 1990, but no decision was made on this request; therefore, the WPCA concluded that AOD was 67 days late on the Contract. The WPCA also stated, ". . . we will have to go back and see what their lateness cost us in terms of our costs, inspection, etc." This indicates that the WPCA was not looking to the liquidated damages clause, but rather was looking to actual damages if any.
 III.
During cross examination, Mr. Juros referred to problems with the project, which are reflected in his evaluation of the Contract pursuant to Exhibit V dated July 12, 1990. Said exhibit refers to 10 problem areas.
Item 1 deals with the time schedule of the project.
Item 2 reflects the concern over the alleged absence of AOD's project superintendent. Reference is made to June 22, 1990, June 25, 1990, June 26, 1990, June 27, 1990, June 28, 1990 and July 20, 1990. A review of Exhibit F (Daily Reports) shows that work was done on all those dates and on June 22, CT Page 6798 1990 it is noted that Mr. DiChello and the superintendent were not present.
Item 3 alludes to the fact that AOD had broken 3 underground electric power lines during installation of the work.
Item 4 points out problems dealing with the breakdown of the contractor's equipment. Item 5 also deals with this concern and that the equipment and the manpower may be leased.
Item 6 alleges that AOD has not performed adequate trench compaction and Item 7 deals with use of filter fabric in the trench.
Item 8 references dust and erosion control due to lack of proper street sweeping.
Item 9 deals with unsatisfactory wet backfill material in the sewer trench.
Item 10 refers to safety in that some of the vehicles allegedly did not have backup signals and backhoe did not have brakes. It is noted that OSHA was not contacted relative to this matter.
A meeting was scheduled with the contractor to address these issues.
 IV.
The substance of AOD's claims are found in Exhibits W, X, RR and GGGG. The claims are two-fold, first the plaintiff attempts to justify reasons for delays in the project and second, it seeks additional costs for work allegedly not covered by the Contract.
Exhibit GGGG is the main document reflecting the claims of AOD. Exhibit RR was an earlier document directed to Mr. Juros which listed AOD's requests. Although Mr. Juros received said document and placed notations thereon, he did not respond to AOD in writing. In this regard, there was testimony that Mr. Juros did not like to respond in writing, preferring verbal responses. This situation could have in part caused misunderstandings and miscommunications concerning the positions of the parties, which in turn may have contributed to the CT Page 6799 inabilities of the parties in resolving their disputes.
Exhibit GGGG tabs the plaintiff's claims from #1 to #17. Each claim is first summarized as to date, reference DR (Daily Inspection Reports) and summary of claims. The claim is then broken down to equipment and work force.
For equipment, the plaintiff uses a blue book rate which reflects a per hour equipment idle on site. For work force, the plaintiff shows an hourly rate for workers depending on their job. Then there is a total loss for equipment and work force plus 15% for contractors overhead and profit.
The defendant, through Anthony Lorenzetti, its Director of Public Works and Town Engineer, established the Contract in a unit contract, where each unit of work is specified and said unit price covers payment for extra work and that the Contract did not provide for use of the blue book to determine amounts for claims by the contractor.
The defendant points out that as to equipment loss, AOD had a lease for the equipment which obligated AOD to pay $3,000 per month for leasing the equipment. The lease was between AOD and ZSC, a corporation where Zwicharowski was president.
The claims outlined in Exhibit GGGG will be taken in order for discussion and determination thereof.
A. Claim #1
The summary of this claim states, "Breakage of shallow, unmarked power line in easement area; occurred at 2:00 p.m."
This claim involves the determination of the location of the easement near house #10 and where AOD started the project. There was testimony as to whether AOD chose to commence work at the easement or whether the defendant required AOD to start there.
AOD started work at the easement and could not continue because the location of the easement had to be determined. Also, while working in the easement area, the plaintiff severed utility wires and the utility company had to be contacted. In this regard Northeast Utilities made a claim CT Page 6800 against the plaintiff for said damages.
Exhibit RR shows a claim of 11 days lost and additional costs of $4,880.00 for this item. However, Exhibit GGGG reflects a claimed loss of $19,375.00 and lost time of 9 days. Said exhibit contains a more specific calculation of the claimed loss than does Exhibit RR.
As to time lost, Exhibit RR claims 11 days, Mr. Juros noted on Exhibit RR 6 days lost and the testimony of Mr. Zwicharowski indicates that about 1 week was lost.
Mr. Juros and Mr. Zwicharowski did not indicate that costs to AOD were attached to said delay.
In this claim, the plaintiff also alleges that it lost nine days (50 hours), and $19,375.00. The attached reports indicate that a sewer trench area was marked out, but when sod removal began, the plaintiff broke utility lines that had not been marked on the easement documents. When the workers opened the area to provide room for the utility workers, telephone and cable lines were severed. The workers had to wait for the utilities to be reconnected. There was further discussion of moving the sewer line so that power lines would not be severed again.
Additionally, the reports show that discrepancies were found in the location of manholes in the easement. Although the plaintiff performed miscellaneous jobs on the site, the plaintiff lost several days waiting for the Town to decide on the appropriate locations of manholes in the easement area.
The defendant points out that pursuant to Article 10 of Plaintiff's Exhibit A, any damages to existing utilities is the responsibility of the contractor.
The town also asserts that the plaintiff went into the easement before the underground utilities were marked and did not follow the requirements of "call before you dig."
As to claim 1, the town also argues that work was not done by the plaintiff on the dates it allegedly did the work. Also, the plaintiff claims payment for hourly rate on equipment which was actually covered by a rental agreement. CT Page 6801
The court is persuaded by the testimony and explanation of the town on this claim.
The court finds that the plaintiff has not sustained its burden of proof that it is entitled to any costs on this claim. Therefore, no costs are awarded. However, the court concludes that a delay on this matter of 9 days is justified.
B. Claim #2
The summary of this claim indicates "unsuitable Etc Sa. 20+75 -21+75 1/16.75LF/Hr = 6 2HRS unproductive."
As to this claim, the plaintiff alleges that it lost 7 days (21 hours) and seeks $10,079.73. The bulk of this claim centers on the plaintiff encountering and removing stumps, rocks and other unsuitable materials from the area being excavated. The reports show that the contractor broke some of the curbing at the site, and started compacting the trench. It was also noted that there was no electrical service in the construction trailer.
Additionally, due to complaints from residents and the engineer that the area was unsafe, fencing had to be put around the site. The plaintiff was informed that the road needed to be kept clean of debris. Some of the barricade lights around the site were not working.
The defendant states that the Contract provides that suitable material removed shall be used for backfill if required, unsuitable material shall be removed by the contractor. Mr. Juros indicated that he deemed the soil to be suitable and ordered it returned to the trench as backfill.
The court concludes that the plaintiff has not substantiated claim 2 for monetary damages or for the 7 days lost time and therefore, finds for the defendant on claim 2.
C. Claim #3
The summary for claim #3 states "Easement [too] wet: Consulted w/engineer/owner, suggested to work @ MH #1 towards MH #10 1 HR unproductive. Dewatering Area Prior to Work." May 15, 1990 is the indicated date. CT Page 6802
In this claim, the plaintiff asserts that it lost 4.13 days (33 hours) and seeks $16,358.02. The reports show that plaintiff continued to remove stumps and rocks from the area. Also, the plaintiff encountered several "water springs" and the wet surface made working conditions difficult. The septic systems encountered had not been indicated on the plans. Also, because one of the stumps removed was large, additional fill had to be delivered to provide proper bedding below the sewer pipe. The inspector told AOD to re-install an anti-tracking mat at the entrances of the work yard and the easement to decrease mud and dirt on Fountainhead Road.
The defendant indicates that the reports for the time period in question shows that the plaintiff did perform work. Also, on May 16, there was only 1/2 day of work due to rain. The 1/2 day was pursuant to an agreement with the contractor and the town. The town claims that rain is an anticipated delay.
Claim 3b is for delay caused by a stump hole in the easement area, i.e. 4 hours unproductive time. Also, "unsuitable and wet, large water spring flooded trench: septic system encountered."
Claim 3c indicates "encountered existing septic system not indicated on plans. Repaved." And 3d states, "provided additional fill over sewer line. Also installed 12" dip." The defendant argues that any fill needed and used was already on the site. The plaintiff did not substantiate this claim by way of documentation such as invoices, purchase orders or checks.
Claim 3d states, "Provided additional fill over sewer line. Also installed 12" dip. Hauling in fill material = 20'W x 4'D/27 = 300 cy @ $8.00 = 2,400.
Claim 3e states, "installed 12" dip: material only." The defendant claims that if this was done, it was required by the contract in that it was work associated with the sewer installation.
Claim 3f indicates, "Had to wait until new electrical service was installed prior to restoration in easement between home #8 and 10."
Claim 3g states, "Assisted utility company in replacing buried lines in easement." The defendant asserts this work CT Page 6803 was the responsibility of the plaintiff. Also, that the plaintiff was obligated to meet the requirements of "call before you dig."
As to claim 3, the defendant argues that the plaintiff did not submit documents to substantiate its claim. The court agrees with the defendant's position on this claim and finds that the plaintiff has not met its burden of proof as to claim 3.
D. Claim #4
In claim four, the plaintiff alleges that it lost 16 hours and seeks $8,431.61. The time lost was due to conflicts with the utilities and the sewer laterals. At one point, the contractor encountered a nest of rocks under the utilities. Some of the contractor's equipment broke, delaying soil testing and lateral installation.
While installing a sewer lateral, an unmarked, unknown curtain/road drain was damaged. The contractor had to repair the drain. Another day was lost due to heavy rain.
The inspector's report indicates that while putting in the lateral, damage was done to the CATV crossing as well as the storm drainage pipe. Also, while digging for the lateral to house #27 Fountainhead Road, the primary electric line was severed. The reports also show that a secondary electric line was broken to house #16 Fountainhead Road.
The town claims that as to claim 4, the work was redirected in furtherance of the completion of the Contract. The town indicates that it was concerned that the contractor was behind in its schedule and that there was deterioration of the edges of the pavement in the trench area.
Testimony was presented by Mr. Juros that the redirection of the work was because of his concern that the contractor was behind schedule. Mr. Juros was also concerned with the conditions of the paving and the pavement.
It is concludes that the direction by the Town in this matter was consistent with AOD's schedule. And while the court finds that the redirection of work by the Town caused the plaintiff a loss of 16 hours or two days, the court finds that CT Page 6804 the plaintiff has not substantiated its money claim for $8,431.61, accordingly, the claim for $8,431.61 is disallowed.
E. Claim #5
The summary of this claim indicates "trench pavement is 5'. Actual was 9' wide, due to existing pavement section did not have process stone and subbase."
In requesting $40,392.00, the plaintiff refers to the Contract price not the blue book rate.
In this claim, the plaintiff alleges a loss of 13 days and seeks $40,392.00. The plaintiff claims that the actual trench pavement width is nine, rather than five, feet, due to the fact that the existing pavement section did not have the process stone and subbase. The plaintiff alleges that Mr. Juros, the project engineer, agreed to additional compensation, however, Mr. Juros testified that he had never made such an agreement.
The town argues that the paving work was covered by the Contract and that the plaintiff submitted his bid with that understanding. Any further payment would require the town pay amounts beyond the Contract provisions.
The plaintiff asserts that even before any of the sewer work started the town planned to pave the roads in Contract 4, which did occur in 1992. The plaintiff feels that the town should have allowed its request for temporary paving.
The town asserts that the width of the roads could have exceeded 5' because in some areas of the trench the soil tended to cave in at the edges; also that traffic was breaking up the pavement and that the area had to be widened to bring up unsuitable material.
The town indicates that it was the responsibility of the contractor to anticipate such widening in its bid price. Mr. Juros testified that he never told the plaintiff that the town would pay for the additional paving. Also, that a decision on this matter could only be made by the WPCA. No evidence was produced to show that the WPCA approved payment for this work. The court is persuaded by the town's testimony and presentation on this issue. The court determines that the work CT Page 6805 claimed here is covered by the contract.
Accordingly, the court finds that the plaintiff has not met its burden of proof on this claim, therefore, said claim is denied.
F. Claim #6
In claim six, the plaintiff alleges a loss of $4,485.00. The town ordered A.O.D. to change the sanitary sewer pipe material to a more expensive pipe. A.O.D. claims losses based on material, installation, equipment, manpower and O 
P.
AOD claims that it installed 300 linear feet at $13.00 per linear foot, which equals $3,900.00. The unit price in the Contract was $22.00 per linear foot, AOD claims that the differential cost from SDR35 to C-900 is $13.00 per linear foot. Mr. Juros testified that the differential cost should be $2.00 — $4.00 per linear foot.
The plaintiff points out that it was directed by Mr. Juros to change the pipe; no change order was issued. The plaintiff did in fact replace the pipe with a C-900 pipe.
The court finds that the plaintiff should be reimbursed for the installation of 300 linear feet of C-900 pipe at the rate of $13.00 per linear foot for a total of $3,900.00.
G. Claim #9
The plaintiff's ninth claim alleges a loss of $8,999.90. A.O.D. claims that the actual field measurements of the curbing differs from the contract measurements. Also, A.O.D. claims that the curbing was damaged prior to commencement of the work, and that A.O.D. was directed to replace the curbing. Mr. DiChello indicated that he was ordered by Mr. Juros to repair the curbing and that the plaintiff would be paid for the curbing, providing any damage thereto was not caused by AOD.
In Exhibit GGGG, the information relative to this claim indicates the field measurements is 1,448 linear feet, that the plaintiff was paid for 330 linear feet, leaving a balance of 1,118 linear feet at $7.00, which equal $7,826.00, plus CT Page 6806 contractor OP of $1,173.90.
This claim is also reflected as item 9 on Exhibit RR where 1,118 linear feet is noted. Mr. Juros circled it and wrote damaged by the contractor.
To prevail on this claim the plaintiff must establish that the town directed the plaintiff to do the additional curbing and to pay for said additional work. This the plaintiff did not do. Also, it has not been proven that the damage to the curbing was not caused by AOD.
The court finds the issues for the defendant on claim 9, in that the plaintiff has not proven that additional linear feet was installed and, if so installed, that it was not the responsibility of AOD.
H. Claim #10
In claim ten, the plaintiff claims a loss of $3,316.54. This loss reflects the restoration work outside of the easement that the town ordered A.O.D. to do. The restoration work was lawn restoration, directed by the town for house #8 and #10 in the easement area.
In this claim, the plaintiff claims an additional 576.79 square yards at $5.00 per square yard for law restoration. The defendant points out that 1,558 square yards of restoration were approved and paid. Also, the defendant argues that the plaintiff never made a claim for this work or that the defendant agreed to pay for said restoration.
The plaintiff points out that the town originally estimated the restoration of 800 square yards. The plaintiff submitted a bid of $5.00 per square yard. A total of 1,558 square yards of restoration were approved and paid for by the town.
The plaintiff claims an additional amount due for $576.79 which was required in the easement area in the area of house #8 and #10.
Mr. DiChello claimed that Mr. Juros ordered the work and indicated that the town would pay for the work. CT Page 6807
The court finds the issues for the plaintiff and accordingly finds for the plaintiff on claim 10 in the amount of $2,883.95.
The plaintiff's claim for contractors OP is denied in that this is a unit price contract.
I. Claim #11
The plaintiff alleges that it lost $28,940.90 in claim number eleven. AOD asserts that the trench areas settled, due to the running underground water table and springs and that the loss is due to the town's order to pave the trench area as soon as possible, even though A.O.D suggested waiting until the area dried. A.O.D had to increase the amount of pavement placed in the settled areas. A.O.D. additionally claims overlay paving ordered by the engineer.
Claim 11 shows an amount of $12,870.80, this is also referenced in Exhibit YY.
This claim deals with the plaintiff's request for $28,940.90 for additional paving because trench pavement allegedly settled. Mr. DiChello asserted that the pavement settlement was due to underground water and springs. The defendant indicates that the Contract provides that the contractor is to replace pavement due to settling below the adjacent grade at no cost to the town. Also, Mr. Juros testified that settlement could be caused by inadequate compaction.
Mr. Juros also testified that the contract, Exhibit A, provides in Article 6 that the contractor shall repair damages caused by his operations and in § 300, the contractor is to maintain the pavement in a safe condition.
The defendant referred to Exhibit 27 and points out that it does not contain an indication that the town was expected or agreed to pay for this work, the court agrees, accordingly, the court finds the issues for the defendant on claim 11.
J. Claim #12
In claim twelve, A.O.D. claims a loss of $7,198.84 and 4.25 days. This claimed loss is due to poor existing underground CT Page 6808 utility installation by various other parties, which delayed A.O.D. at every lateral crossing. There were 34 such conflicts claimed, each costing approximately one hour.
The town argues that the allegation of 34 conflicts is not substantiated by the evidence; the defendant does concede that there were 24 crossings, but however still disputes this claim.
The court cannot find, based on the evidence presented, that the utility crossings delayed the plaintiff or that any such delay was associated with the town.
The court accepts the testimony of Mr. Juros on this claim, namely that there was poor underground existing utilities and that these matters were contemplated by the original Contract.
The court therefore denies the plaintiff's recovery for claim 12.
K. Claim #14
In claim fourteen, A.O.D. claims the amount of $25,249.85, as retainage that has not been released, and is due since 1990, plus interest which interest is calculated at 10% per year. The original retainage was $18,062.92.
The town justifies retaining the retainage because it questioned if the plaintiff was paying State of Connecticut prevailing wage rates. In July of 1992, the town received a complaint from one of plaintiff's employees that he was not receiving proper wages, however, the plaintiff points out that the town was not notified by the State of Connecticut concerning alleged wage violations.
As to claim 14, the plaintiff seeks the retainage in the amount of $18,062.92 plus interest pursuant to § 37-3a.
The defendant agrees that the retainage is due, however, it argues that the interest should be disallowed because it has a set off against the plaintiff on the issue of proper wages being paid to the plaintiff's employees. It also points out that the plaintiff never provided the defendant with proof that it paid proper wages to its employees. CT Page 6809
The plaintiff asserts that it satisfied the town that it supplied sufficient information to show the nature of the wage issue. The court finds that the town was not justified in withholding the retainage based on the wage issue.
Therefore, the plaintiff is entitled to recover its retainage of $18,062.92 plus interest pursuant to Conn. Gen. Stat. § 37-3a, at the rate of 10% per year, commencing from the substantial completion date of October 5, 1990.
L. Claim #15
In claim fifteen, A.O.D. claims $2,420.80. This cost accrued because the bonding company was holding a letter of credit as collateral for the town's bond. A.O.D. procured another bond and wanted to substitute it for the existing bond, but the town refused to exchange the bond.
The plaintiff claims it was required to maintain the performance bond from the date of substantial completion through February 1993, when the bank in question was taken over by the FDIC.
The performance bond is dated January 25, 1990, and is in the amount of $396,200.00. It is contained in Exhibit A and designated #8640 GC-54. The surety on the bond is Covenant Mutual Insurance Company.
The plaintiff points out that the letter of credit obligation on the bond was rendered nugatory in 1933 when the bank was taken over by the FDIC.
The court accepts the plaintiff's testimony and position on Claim #15 and allows recovery as set forth in Exhibit GGGG in the amount of $2,420.80.
M. Claim #16
In claim sixteen, the plaintiff claims a loss of $6,241.10 and 16 hours. The plaintiff asserts that after finding a hole in the road, the parties agreed that the responsible party would pay to repair the hole. Also, that the problem was caused by a buildup of water due to unsuitable material. A.O.D. repaired the hole and has not been reimbursed for CT Page 6810 labor. The work was done after substantial completion.
In this claim, the plaintiff seeks reimbursement for work done to repair a sink hole at the intersection of Fountainhead Road and Preston Avenue. Mr. DiChello indicated that the town agreed to pay for the work if it were not caused by AOD. The town disputes this and says it only agreed to provide the material for the corrective work.
The plaintiff has satisfied the court that the problem in question was not caused by AOD, that it did the corrective work subsequent to substantial completion and that the town agreed to pay for the work.
However, the court finds that the plaintiff has not established that it is entitled to $6,241.10. This total consists of an amount for equipment, work force and contractors OP at 15%.
The court does not allow the amount for equipment, except for the use of an excavator, which is not covered by the lease, in that the plaintiff had a lease for providing equipment nor does the court allow the contractor's claim for OP as this is a unit contract.
Accordingly, as to claim 16, the court allows an award of $3,391.32 for labor and $1,587.68 for equipment for a total of $4,979.00.
N. Claim #17
In claim seventeen, the plaintiff alleges a loss of one day and $1,803.57. The town argued that there was a leak in the line, and ordered an air test. The parties allegedly agreed that if there was a leak, A.O.D. would repair it. If no leak was found, the town would reimburse A.O.D. for the air test. A.O.D. did not find a leak, but the town has not paid for the air test. This repair work was done after substantial completion.
The court accepts the plaintiff's position on this claim as set forth in Exhibit GGGG and awards the plaintiff $1,803.57.
V. (Counterclaim)
CT Page 6811
The defendant's pleading contained a four count counterclaim against the plaintiff.
Count one alleges costs and expenses were incurred because of delays by the plaintiff. Count two alleges that the plaintiff failed to perform its work according to specifications and performed its work in a defective manner. Count three states that the plaintiff caused damage to the storm water drainage system and count four claims that an offer of compromise was reached and that the plaintiff failed to perform pursuant to the Agreement.
As to count four, the defendant presented the testimony of William Tracy, who was the Town Attorney for the Town of Plymouth. Attorney Tracy indicated that there was a proposed settlement that was approved by the town and sent to the plaintiff's attorney with an executed settlement check. The documents were sent back by the plaintiff's attorney, followed by a telephone call that the plaintiff would not accept the proposed terms. Since the plaintiff did not accept the settlement proposed by the defendant and did not sign it, there was no meeting of the minds and therefore, the offer of compromise was never consummated.
As to count three, the defendant presented video tapes by The Farrelly Company, Exhibits 51, 52, 53 and 54 and a TV inspection log, Exhibit 50. The TV inspection log indicates the project to be "Town of Plymouth Storm Drainage Inspection" and is dated from March 5, 1992 to March 31, 1992. It designates the locations to be Tumblebrook Road, Fountainhead Road and Oakdale Road. It also reflects the pipe size to be 12". The videos depict debris in the pipe line, offset joints, broken and cracked pipes. Mr. Lorenzetti indicated that another project was required to repair the damage, and that the construction of the sewer line by the plaintiff caused damage to the storm drainage. He stated the cost to repair the damage was $12,431.92.
In response to this claim, the plaintiff refers to Exhibit SSS, which also is a TV inspection log by The Farrelly Corporation dated July 7, 1992. Said log indicates the project to be Fountainhead Road, Crestview Road, Oakdale Road and Tumblebrook Road, Plymouth, Connecticut. The plaintiff also submits a video Exhibit RRRR. The inspection logs for the CT Page 6812 plaintiff show no problems with the pipes.
The plaintiff argues that the video, Exhibits 50-54, show that the storm drainage system is in poor condition. Also, the videos are simply runs of storm drainage, filmed by Farrelly, and show the need for storm drainage repair.
The plaintiff asserts and the court agrees that the videos do not establish that AOD is responsible for the damage to the storm drainage.
Therefore, the defendant has failed to sustain its burden of proving that AOD had caused the damage in question and accordingly, it cannot prevail on this claim.
VI. (Liquidated Damages)
Article I, subsection b of the Contract and General Conditions provides:
 The Contractor hereby agrees to commence work under this Contract on or before a date to be specified in a written "Notice to Proceed" of the Owner and to substantially complete the project within 120 consecutive calendar days thereafter and to fully complete the project within 30 consecutive calendar days thereafter. The Contractor further agrees to pay, as liquidated damages, the sum of $500.00 for each consecutive calendar day thereafter as hereinafter provided in the Contract and General Conditions.
Exhibit A, p. GC-2. The Information for Bidders contains the same provision, with the addition of the sentence "IT IS UNDERSTOOD, TIME IS OF THE ESSENCE." Exhibit A, Information for Bidders, Article 22, p. 7.
Article 26 of the Contract and General Conditions provides that (a) the time for beginning and completing the work are essential conditions of the contract, (b) the work shall be prosecuted diligently and that the time for completion is reasonable, (c) if the Contractor fails to complete the work, he will pay the amount specified in the contract, (d) the CT Page 6813 said amount is fixed because of the difficulty of fixing actual damages the Owner would sustain, and (e) time is of the essence. Exhibit A, pp. GC-21-22.
Article 26 further provides that the Contractor shall not be charged with the liquidated damages if the delay is due to (1) any preference, priority or allocation order issued by the Government, (2) an unforeseeable cause beyond the control and without fault or negligence of the Contractor, or (3) any delays of subcontractors or suppliers occasioned by any of the causes specified in (1) or (2). Id., p. GC-22.
 It is settled law that a contract provision which imposes a penalty for a breach of the contract is contrary to public policy and is invalid, but a contractual provision which fixes liquidated damages for a breach of the contract is enforceable if it satisfies certain conditions. . . . The conditions which will justify an agreement for liquidated damages are: (1) The damage which was to be expected as a result of a breach of the contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damages which, as the parties looked forward, seemed to be the presumable loss which would be sustained by the contractee in the event of a breach of the contract.
(Citations omitted; internal quotation marks omitted.) NorwalkDoor Closer Co. v. Eagle Lock Screw Co., 153 Conn. 681, 686,220 A.2d 263 (1966). "[N]o provision in a contract for the payment of a fixed sum as damages, whether stipulated for as a penalty or as liquidated damages, will be enforced in a case where the court sees that no damage has been sustained." Id., 688. See also, St. Margaret's-McTernan School, Inc. v. Thompson,31 Conn. App. 594, 597, 626 A.2d 449 (1993).
The plaintiff argues that the Town was never denied the beneficial use of the sewer line so as to justify liquidated CT Page 6814 damages. The plaintiff further contends that the Town's liquidated damages claim does not refer to the ultimate operation of the whole system, but rather the actual expenditure for additional Engineering administration and inspection. Because the parties negotiated for and contracted for these expenditures, the damages are neither uncertain in amount nor difficult to prove.
The plaintiff also claims that the Town waived the completion date, because AOD essentially received an extension to perform work on the site.
Further, plaintiff argues that the Town never claimed liquidated damages from the end of the 120 day completion date to the date that Substantial Completion was declared, and no money due to AOD was held back, nor was money withheld between the date of Substantial Completion and the issuance of the Final Completion Certificate. The Final Completion Certificate does not refer to liquidated damages, but rather certifies the value of the work performed and material furnished and advises that the release of all project bonds will be one year from the date of issuance. Exhibit U.
Furthermore, not only was AOD allowed to remain on the job after the 120 day deadline, but it finished the work, performed additional work, and received payment for said work without protest.
The defendant argues that the damage is uncertain in amount or difficult to prove because at various stages of the project, different functions and operations were to be ongoing, with overlap occurring at various times. Depending on at what stage the delay occurred, the next stage or stages would be harmed, and such damages could only be determined at that particular point in time.
The defendant also argues that the parties intended to liquidate damages in advance, as evidenced by the contract provisions cited above. The defendant further claims that none of the exceptions to the liquidated damages provision applies.
In addition, the defendant argues that the amount stipulated was reasonable, in that it was not greatly disproportionate to the amount of damage which could be the presumable loss. CT Page 6815
As has been indicated, a liquidated clause will not be enforced where the court sees that no damage has been sustained. That is the situation here.
In this case, the number of days delay has not been clearly established. For example in Claim #1, the plaintiff claims loss of 9 days, Claim #2, 7 days loss is indicated, Claim #3, 4.13 days, etc. Also, the plaintiff claims that the reason for some of the delays was due to rainy weather.
The precise and full extent of the days claimed lost have not been fully established by the plaintiff or refuted by the defendant. Based on the evidence presented, the court cannot determine the actual number of days of delay that were justified and therefore, could not apply the provisions of the liquidated damages clause.
It appears that the town never claimed liquidated damages at least up to October 26, 1990. Further, at a meeting of the WPCA it was indicated that the WPCA would have to go back and determine any damages due to the delay. These factors cause the court to conclude that the town waived the provisions of the liquidated damages clause. Therefore, if damages were claimed by the town because of alleged delays by the plaintiff, this would have to be established by the town, this they did not do.
From the evidence presented, the court finds that any damages alleged by the town, as a result of alleged delays by the plaintiff, have not been established by the required degree of proof. For all the above mentioned reasons, the court will not enforce the liquidated damages clause.
As to the allegations of the defendant's counterclaim, the court finds that the defendant has not established said allegations by a preponderance of the evidence and therefore, finds for the plaintiff on the defendant's counterclaim.
SUMMARY
The court finds for the plaintiff only on the following claims and makes an award as follows: CT Page 6816
Claim #6 $ 3,900.00
Claim #10 2,883.95
 Claim #14 (plus interest 18,062.92 pursuant to § 37-3a C.G.S. at the rate of 10% per year
Claim #15 2,420.80
Claim #16 4,979.00
Claim #17 1,803.57
The court finds the issues for the plaintiff on the defendant's counterclaim.
ROBERT F. STENGEL JUDGE, SUPERIOR COURT